UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THOMAS LAMARCO and DIANE LAMARCO,

                              Plaintiff,                    22 Civ. 4629 (GRB) (JMW)

    -against-                                **PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

SUFFOLK COUNTY, New York, Commissioner
RODNEY HARRISON, Individually and in his
Professional capacity, Captain WILLIAM SCRIMA,
Individually, Sgt. WILLIAM WALSH, Individually,
Police Officer CIARA PLIHCIK, Individually,

                              Defendants.
-------------------------------------------------------------x

Plaintiffs, THOMAS LAMARCO and DIANE LAMARCO, by and through their attorneys. The Bellantoni Law, Firm, PLLC, herein provide the following Statement of Undisputed Material Facts pursuant to Local Rule 56.1.

1.     Thomas and Diane LaMarco are residents of Suffolk County, New York [Bellantoni Declaration at Exhibit 7 at 5; Ex. 8 at 11-12].

2.     The LaMarcos' adult son, Matthew, also resides with them [Ex. 7 at 26; Ex. 8 at 13].

3.     Plaintiffs have held valid New York State pistol licenses issued by the Suffolk County Police Department for 15+ and 10 years, respectively, without incident [Ex. 1 ¶ 48].

4.     At no time have Plaintiffs suffered from any prohibitor to the possession, purchase, use, or ownership of firearms [Ex. 1 ¶ 49].

5.     On April 9, 2021, Defendants suspended Plaintiffs' pistol licenses for reasons unrelated to Plaintiffs' eligibility to possess firearms [Ex. 1 at ¶ 50].

1

***Thomas and Diane LaMarco***

6. Thomas LaMarco ("Tom") has been employed as a Certified Public Accountant since 1989 [Ex. 7 at 6-7] and Diane has been employed for thirty-two years as a speech pathologist for a pre-school [Ex. 8 at 14-15].

7. Tom holds a New York State pistol licenses issued by Suffolk County [Ex. 7 at 9-10].

8. Tom first obtained a New York State pistol license between 28-30 years ago [Ex. 7 at 16].

9. Tom has two handguns registered to his pistol license [Ex. 7 at 17-18].

10. Tom has used his handguns for target shooting, with Diane and by himself [Ex. 7 at 28-29].

11. Until the events complained of in this action, Tom's pistol license had never been suspended [Ex. 7 at 35]. Diane LaMarco ("Diane") holds a New York State pistol license issued by the Suffolk County pistol License Bureau ("SCPD") [Ex. 8 at 16, 28].

12. Diane was first issued a New York State pistol license in 2006 [Ex. 8 at 20].

13. When Diane applied for a pistol license, Tom had already had a New York State pistol license [Ex. 8 at 27].

14. Diane has held a pistol license continuously since its issuance and, until the incidents at issue here, it has never been suspended or revoked [Ex. 8 at 29-30].

15. Diane goes target shooting with the Smith & Wesson handgun registered to her pistol license [Ex. 8 at 54].

2

*Medical / Aided Calls for an Ambulance for the LaMarco's Adult Son, Matthew*

16. The LaMarcos have called for an ambulance three times in the past to transport Matthew to the hospital for a mental health evaluation; SCPD officers always show up to accompany the ambulance staff [Ex. 7 at 10, 14; Ex. 8 at 46-47].

17. At no time has Matthew ever threatened to harm himself or anyone else; violence was never a concern [Ex. 8 at 55].

18. When SCPD officers arrive with the ambulance staff, they ask if the LaMarcos own any weapons/if there are any weapons in the home; Diane has always responded, "yes" [Ex. 8 at 47-48].

19. On at least one occasion, an SCPD officer asked how the weapons were secured and Diane showed the officer the combination lock on the closet inside of her and Tom's bedroom, she opened up the closet and showed the officer the safe inside of the closet; she opened up the safe and showed the officer that the firearms inside had trigger locks on them; she then showed the officer the separate safe where the trigger lock key was stored [Ex. 8 at 49].

20. The handguns belonging to Tom and Diane, both of which are licensed, are stored in the combination locked closet safe [Ex. 8 at 60].

21. None of the LaMarcos' adult children have used any of their weapons [Ex. 7 at 37].

22. The LaMarcos also keep other important documents in the safe, not just firearms [Ex. 8 at 59].

23. The safe in which the LaMarcos store their handguns is very heavy and cannot be easily moved; it would take about four people to move it [Ex. 8 at 49-50].

24. No one other than Tom and Diane have the combination to the safe [Ex. 8 at 59].

25. No SCPD officers seized the LaMarcos handguns at any time when officers responded with the ambulance staff [Ex. 8 at 50].

26. Matthew has not been to a hospital for any mental health issues since 2021 [Ex. 8 at 52].

*April 2021 Suspension of LaMarcos' Pistol Licenses*

27. Diane was required to renew her pistol license on or before April 2021 [Ex. 9 at 81-84].

28. Diane filed her renewal application in March 2021 [Ex. 9 at 85].

29. Diane's previous pistol license renewal was approved on February 1, 2016 [Ex. 9 at 81-82].

30. When a renewal application is submitted, a secretary reviews the application and, if there are no issues, the renewal will be approved [Ex. 10 at 15].

31. In reviewing Diane's renewal application, a License Bureau staff member noted on Diane's pistol license file, "Failed to inform of CPEP[1] of son – multiple incidents – assigned to Officer Plihcek" [Ex. 9 at 83-84].

32. In April 2021, Walsh suspended Diane's pistol license by letter Notice of Suspension; Diane's was dated April 9, 2021 and Tom's was dated April 12, 2021 [Ex. 2].

33. The LaMarcos' pistol licenses are still suspended [Ex. 7 at 18; Ex. 8 at 71].

34. Diane and Tom were required to surrender their handguns to their local SCPD precinct, which they did [Ex. 2; Ex. 8 at 63; Ex. 7 at 34-35; Ex. 9 at 79].

35. Tom and Diane were required by Officer Ciara Plihcek to write a letter explaining the circumstances surrounding the suspension of their licenses [Ex. 7 at 29-30] which Tom wrote for the both of them [Ex. 3; Ex. 7 at 30].

---

[1] Comprehensive Psychiatric Emergency Program.

4

36. Within a week or two after being suspended, Tom had two telephone conversations with the License Bureau, one of which was with Officer Plihcek, about what needed to be done to reinstate their licenses; he was told that he must produce a letter from Matthew's doctor indicating that Matthew is not in a position to harm himself or anyone else, and that would "possibly" be the "first step in getting it reinstated" [Ex. 7 at 19-22].

37. Diane spoke with Matthew's doctor, but she could not obtain a doctor's letter to provide to the License Bureau regarding Matthew [Ex. 8 at 65-68; Ex. 7 at 21-22].

38. After not being able to obtain a letter from Matthew's doctors, Tom contacted an attorney [Ex. 7 at 23].

39. Tom still possesses several long guns - shotguns and rifles - in his home, which are stored in the locked bedroom closet [Ex. 7 at 25, 27-28].

***Suffolk County Policy***

40. The LaMarcos' licenses were suspended because "a mental health assist" occurred concerning "member of [their] household" [Ex. 2; Ex. 8 at 30-33].

41. The LaMarcos' licenses were suspended because they did not report to the License Bureau that "a mental health assist" occurred concerning "member of [their] household" [Ex. 2; Ex. 8 at 30-33].

***Defendant, William Walsh***

42. At all times relevant to this action, William Walsh ("Walsh") was the Sergeant of the SCPD Pistol License Bureau [Ex. 9 at 11].

43. In April 2021, Walsh signed Notices of Suspension for licensees suspending their pistol licenses "based on the policy and procedure and handbook from the Pistol License Bureau"

5

[Ex. 9 at 17].

44. Walsh had authority to sign Notices of Suspension and suspend pistol licenses when his lieutenant was not in the office [Ex. 9 at 27, 28].

45. The licensee is suspended on the date the letter of suspension is sent [Ex. 9 at 29].

46. SCPD publishes a Pistol License Handbook ("Handbook") that contains the "rules, procedures, guidelines for a pistol licensee" [Ex. 9 at 20].

47. The Handbook provides licensees with information about the circumstances under which their license could be suspended or revoked [Ex. 9 at 21].

48. The Handbook identifies the requirements under state and federal law for an individual to be eligible to own a firearm [Ex. 9 at 23].

49. According to the Handbook, "Aside from [] statutory prohibitors, the Pistol License Bureau can also make a determination about whether someone is eligible based on their discretion" [Ex. 9 at 23-24].

50. Under the Handbook, if anyone residing in the home (including a non-licensee) is arrested, and the licensee does not report the incident to the License Bureau, the licensee's pistol can be suspended or revoked [Ex. 9 at 25-26].

51. References in the Handbook to "the licensing officer" mean and encompass the police commissioner's office, the lieutenant, the sergeant, or any licensing officer in the License Bureau [Ex. 9 at 27].

52. At the renewal of a pistol license, the License Bureau renewal performs a "review of the licensee of any incidents that may be police related that happened the prior -- during the time that -- that they had the license" [Ex. 9 at 32].

53. Through SCPD computer programming, the License Bureau is notified of certain incidents including mental health issues when SCPD officers respond to the home of a licensee for

6

a mental health assist [Ex. 9 at 32-33].

54. When SCPD officers respond to a licensee's home relating to the mental health of a licensee or any household members, that information is sent to the License Bureau [Ex. 9 at 33-34].

55. Under SCPD policy, if a licensee resides with someone who had a mental health issue or who was transported to a hospital for a mental health-related issue, that constitutes grounds to suspend the licensee's pistol license [Ex. 9 at 34-36].

56. A pistol license would not be suspended (or the suspension would be lifted) if the co-habitant moved out of the licensee's home [Ex. 9 at 35].

57. Under the Handbook, the absence of a statutory "automatic bar" to firearm possession "does not guarantee the issuance or renewal of a pistol license. There are many other factors that are considered in the investigation into an individual's qualification to possess a pistol license" [Ex. 6; Ex. 9 at 36].

58. If a household member of an applicant or licensee is "likely to engage in conduct that will result in serious harm to self or others" a renewal will be denied and/or application will be denied [Ex. 6; Ex. 9 at 37-39].

59. Under the Handbook, if the License Bureau feels there is 'good cause' or "other good cause" - another reason why they shouldn't renew a pistol license - then the license will not be renewed [Ex. 6; Ex. 9 at 39].

60. There is "discretion" exercised as to whether to renew the license [Ex. 9 at 39].

61. The LaMarcos' licenses were suspended after an administrative review identified that SCPD police officers had responded to their home regarding a mental health issue concerning their son, Matthew [Ex. 10 at 9-10].

62. The LaMarcos were required by the Handbook to inform the License Bureau that their son "required mental health assistance"; their failure to inform required the suspension of their

7

licenses [Ex. 10 at 9-10].

63. Walsh made the decision to suspend the LaMarcos' pistol licenses [Ex. 1; Ex. 9 at 72-73;].

64. Once the suspension notice is sent to the licensee, the matter is assigned to an investigator to perform the suspension investigation [Ex. 9 at 43-44].

65. Suspended licensees must provide a written statement regarding the underlying events leading to the suspension, including Thomas and Diane LaMarco [Ex. 3; Ex. 9 at 44, 64, 75-76].

66. Where the underlying incident involved a medical transport or a mental health issue, the licensee must also provide the underlying medical records pertaining to that incident [Ex. 4; Ex. 9 at 45, 60].

67. Walsh created a PowerPoint presentation to use in his instruction at the Police Suffolk County Academy related to pistol licensing policies in effect in 2020-2021 [Ex. 5; Ex. 9 at 47-51].

68. Events giving rise to "grounds" for "suspension or revocation" of a pistol license include "a psychiatric episode concerning a household member of a licensee" [Ex. 9 at 51-53].

69. There are "numerous scenarios" involving a household member's actions that could cause the suspension or revocation of a licensee's pistol license [Ex. 9 at 51-55].

70. Under the policies and procedure of SCPD, police officers responding to a residence involving any events that could cause the suspension or revocation of a pistol license are required to forward the incident reports to the Pistol License Bureau [Ex. 9 at 57-58].

71. SCPD officers are also required to "relay questionable behavior" for licensees and household members to the License Bureau [Ex. 9 at 59-60].

72. SCPD required licensees to obtain the medical records of household members who are transported for a mental health evaluation [Ex. 4; Ex. 9 at 61-62].

73. Licensees have previously obtained the written authorization of family members allowing the License Bureau to obtain the mental health records of their household/family members so SCPD will reinstate their pistol licenses [Ex. 9 at 62-63]. The mental health records of the non-licensee cohabitant are "necessary" for SCPD "to complete an investigation to determine the fitness of the above individual to reside in a home with firearms" [Ex. 4; Ex. 9 at 64].

74. SCPD requires the mental health records of a non-licensee so the investigating police officer can determine whether the non-licensee is "fit" to live in a house where firearms are possessed [Ex. 4; Ex. 9 at 64-65].

75. The SCPD medical records release form also requires the licensee to provide a letter from the co-habitant's physician indicating the "reason for treatment…medications prescribed and its effects, possible side effects on patient and your professional opinion as to the competence of the patient to reside in a home with firearms" [Ex. 4; Ex. 9 at 67].

76. SCPD does not have a psychiatrist, psychologist, or other mental health professional on staff to review the mental health records [Ex. 9 at 66].

77. A license's pistol license will not be reinstated without a letter from a physician stating that the co-habitant is fit to reside in a home where other people possess firearms [Ex. 9 at 69].

78. The SCPD mental health release indicates "I am aware that the information disclosed pursuant to this authorization may be subject to re-disclosure and would no longer be protected" [Ex. 4; Ex. 9 at 70].

79. Under the SCPD mental health release, a failure to obtain the authorization from the household member "will affect my eligibility to possess a pistol license" even though the firearms are stored from the co-habitant [Ex. 4; Ex. 9 at 71].

80. The safe storage of firearms from co-habitants is irrelevant to the requirement that licensees obtain a doctor's written assurance that "it would be safe to have firearms in the house," even if SCPD officers "verified" that all the LaMarcos' firearms are locked up [Ex. 9 at 77-78].

***Defendant, Ciara Plihcek***

81. Police Officer Ciara Plihcek was assigned to the Pistol License Bureau in 2017 [Ex. 10 at 13].

82. After the LaMarcos' pistol licenses were suspended by Sgt. Walsh, their files were assigned to Officer Plihcek for investigation [Ex. 9 at 84; Ex. 10 at 16].

83. Plihcek was notified that the LaMarcos' licenses were suspended because they failed to notify Pistol License Bureau of a mental health issue within their household as they were required to do so" [Ex. 10 at 17].

84. Plihcek received no training from SCPD or the legal bureau at SCPD regarding the Constitution or the Second Amendment [Ex. 10 at 20].

85. When asked how Tom LaMarco was "ineligible to possess handguns" based on the fact that his son is ineligible to possess firearms, Plihcek responded, "Because it's a common practice at the Pistol License Bureau that the entire household is held to the same standard as the licensee, the same eligibility" [Ex. 10 at 21].

86. Under SCPD policy, "if one person in the household is not eligible, the entire household is held to that" [Ex. 10 at 22]; this policy has been in effect since Plihcek began working in the License Bureau in 2017 [Ex. 10 at 22].

87. The LaMarcos cannot have their pistol licenses reinstated until they "receive a note from their son's treating physician stating that there's no issues with him residing in a home with firearms or if his son moved out of his home" [Ex. 10 at 22, 29-30].

88. If the LaMarcos cannot obtain a letter from their son's doctor, their licenses will remain in a suspended status [Ex. 10 at 22-23].

89. Even if the LaMarcos obtained the requested doctor's letter, that would only be "the first step" to reinstating their pistol licenses; Plihcek would still have to conduct an "investigation [Ex. 10 at 32].

90. Even if the LaMarcos submitted a letter from their son's treating physician that he is "competent to reside in a home with firearms," and a 911 check and background check were run and came back clean, Plihcek would still need to obtain "updated written statements from both of the licensees" consisting of another "statement of what occurred in the household" including any "new incidents" "before their licenses could be reinstated [Ex. 10 at 32-34].

91. If the updated statements reveal new events with their son that the LaMarcos had not reported to the License Bureau in the interim, the suspension of their licenses would continue because they did not comply with the Handbook [Ex. 10 at 32-36].

92. There are "many variables" involved as to whether the LaMarcos' licenses will be reinstated, even if they obtain a doctor's note, and have no further incidents; "each case is different" [Ex. 10 at 37].

93. Plihcek did not speak with any of the police officers who responded to the LaMarcos' home [Ex. 10 at 23].

94. Plihcek did not request or schedule any home visit to ascertain how the LaMarcos store their firearms [Ex. 10 at 23].

95. Plihcek learned of how the LaMarcos store their firearms from their file but safe storage of their firearms is not relevant to the restoration of their licenses [Ex. 10 at 24-25].

96. The LaMarcos' son is "ineligible" to possess firearms based on the fact that he was "transported to a psyche ward for a mental health evaluation" [Ex. 10 at 25].

97. Under SCPD policy, a transport for an evaluation alone renders someone "ineligible" to possess firearms [Ex. 10 at 25].

98. Walsh and Plihcek required the LaMarcos to obtain a medical release from their adult son, Matthew, to obtain Matthew's mental health records be sent to the License Bureau for review in connection with the suspension of the LaMarcos' pistol license [Ex. 9 at 61; Ex. 10 at 26-27; Ex. 4].

99. Under SCPD policies, the LaMarcos were deemed by Walsh to be "unfit" to possess handguns because their son needed and had a "mental health assist" [Ex. 9 at 73].

100. The LaMarcos were deemed unfit to possess handguns because the Handbook defined them as being unfit for not reporting to the License Bureau the incidents where an ambulance was called to transport their son for a mental health evaluation [Ex. 9 at 73-74].

101. Diane brought this action because it is her "right to own a gun and she did nothing to have it taken away" [Ex. 8 at 16-17].

Dated: May 6, 2024
Scarsdale, New York

                                          THE BELLANTONI LAW FIRM, PLLC
                                          *Attorneys for Plaintiffs*

By: ___/s/_____
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com