UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
THOMAS LAMARCO and DIANE LAMARCO,

                        Plaintiff,                  22 Civ. 4629 (GRB) (JMW)

   -against-


SUFFOLK COUNTY, New York, Commissioner
RODNEY HARRISON, Individually and in his
Professional capacity, Captain WILLIAM SCRIMA,
Individually, Sgt. WILLIAM WALSH, Individually,
Police Officer CIARA PLIHCIK, Individually,

                        Defendants.
---------------------------------------------------------------x


# MEMORANDUM OF LAW
# IN SUPPORT OF PLAINTIFFS'
# MOTION FOR SUMMARY JUDGMENT


**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**abell@bellantoni-law.com**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ......................................................................................... 1

UNDISPUTED MATERIAL FACTS ................................................................................ 2

LEGAL ARGUMENT ........................................................................................................ 8

Summary Judgment Standard ............................................................................................. 8

The *Bruen* Standard For Second Amendment Challenges .............................................. 8

I. PLAINTIFFS' CONDUCT FALLS WITHIN THE PLAIN TEXT ..................... 10

II. SUFFOLK COUNTY MUST NOW JUSTIFY ITS REGULATIONS ............... 10

III. SUFFOLK COUNTY'S POLICIES VIOLATE THE FOURTH AMENDMENT FACIALLY AND AS APPLIED TO PLAINTIFFS .................................................. 11

IV. SUFFOLK COUNTY IS LIABLE UNDER *MONELL* ........................................ 11

CONCLUSION ................................................................................................................ 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v S.H. Kress & Co.*,
  398 U.S. 144, 90 S.Ct. 1598 (1970) ................................................................................................ 8

*Crawford v. Washington*,
  541 U.S. 36 (2004) ........................................................................................................................ 9

*D.C. v. Heller*,
  554 U.S. 570 (2008) ................................................................................................................. 9, 10

*Gamble v. United States*,
  587 U.S. ––––, 139 S.Ct. 1960 (2019) ........................................................................................... 9

*Harrell v. City of New York*,
  138 F. Supp. 3d 479 (S.D.N.Y. 2015) .......................................................................................... 11

*Leon v Murphy*,
  988 F.2d 303 (2d Cir.1993) ............................................................................................................ 8

*Monell v Dep't of Social Servs. of the City of NY*,
  436 U.S. 658, 98 S. Ct. 2018 (1978) ............................................................................................ 13

*Nevada Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ....................................................................................................................... 9

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ............................................................................................................. 1, 2, 9, 10

*Payton v. New York*,
  445 U.S. 573 (1980) ..................................................................................................................... 11

*United States v. Cruikshank*,
  92 U.S. 542, 23 L.Ed. 588 (1876).................................................................................................. 10

*United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*,
  461 U.S. 555 (1983) ................................................................................................................ 11, 12

*United States v Jacobsen*,
  466 U.S. 109 (1984) ..................................................................................................................... 11

*Virginia v. Moore*,
  553 U.S. 164 (2008) ....................................................................................................................... 9

**Rules**

Fed.R.Civ.P. 56(a) ........................................................................................................... 8

**PRELIMINARY STATEMENT**

Thomas and Diane LaMarco ("Plaintiffs") submit the within Memorandum of Law, Statement of Undisputed Material Facts pursuant to Local Rule 56.1, and the Declaration of Amy L. Bellantoni with annexed exhibits in support of their Motion for Summary Judgment.

This action arises from the policies of the Suffolk County Pistol License Bureau ("SCPD" or "License Bureau") of banning the possession of handguns by individuals who have no disqualifiers to the possession of firearms under state or federal law but (i) reside with a person SCPD considers to be "prohibited" from possessing firearms[1] and/or (ii) 'disobey' the "Pistol License Bureau Handbook," which imposes requirements on licensees that cannot be found anywhere in state or federal law.

Plaintiffs' right to possess handguns will continue to be extinguished until they either obtain a letter from their adult son's treating physician (and their son's mental health records) indicating that *their son* is competent to reside in a home where firearms are possessed – or their son moves out of their home. Under SCPD policy, "everyone in the household is held to the same standard" of firearm eligibility. The safe storage of handguns is irrelevant; "if one person is in the household is ineligible, then the entire household is ineligible" [56.1 Statement at ¶¶85-86]. Notably, SCPD did not seize Plaintiffs' rifles and shotguns [56.1 Statement at ¶39].

Plaintiffs' conduct – the possession and carriage of weapons in common use - is covered by the plain text of the Second Amendment. SCPD policies prevent Plaintiffs' exercise of presumptively protected rights. Under *NYSRPA v. Bruen*, 597 U.S. 1, 17 (2022) the burden falls

---

[1] In *Milau v. Suffolk County, et al.*, 17 Civ. 6061 (JS)(SIL), the plaintiff's pistol license was suspended because his adult son, with whom he resides, is prohibited from possessing firearms due to a prohibiting misdemeanor conviction. See also, *Torcivia v. Suffolk County, et al.*, 15 Civ. 1791 (EDNY) (GB) (grounds for Suffolk County's 2014 revocation of plaintiff's pistol license included (i) plaintiff's daughter had been 'treated for mental health issues'; (ii) aided calls to the home related to his daughter; and (iii) plaintiff's failure to notify the License Bureau of the foregoing).

1

on Suffolk County to demonstrate that its policies are consistent with the plain text of the Second Amendment, and this Nation's history and tradition. *Id.* Only then can the continued enforcement of SCPD policies be justified. *Id.*

Because the challenged SCPD policies are inconsistent with the plain text of the Second Amendment and have no roots in this Nation's historical traditions, Plaintiffs are entitled to summary judgment and the permanent injunction thereof.

## UNDISPUTED MATERIAL FACTS[2]

Plaintiffs reside in Suffolk County, New York with their adult son [Statement of Undisputed Material Facts "SOF" at ¶¶1-2]. Since 1989, Thomas LaMarco ("Tom") has been employed as a Certified Public Accountant and Diane LaMarco ("Diane") has been a pre-school speech pathologist for thirty-two years [SOF ¶6].

Plaintiffs have held valid New York State pistol licenses issued by SCPD for approximately 30 years and 18 years, respectively, and have never suffered from any prohibitor to the possession, purchase, use, or ownership of firearms [SOF ¶¶3-4, 7-8; 11-12].

On April 9, 2021, Defendants suspended Plaintiffs' pistol licenses for reasons unrelated to Plaintiffs' eligibility to possess firearms [SOF ¶5]. Until then, neither Plaintiffs' pistol license had ever been suspended [SOF ¶¶11; 14].

Over the years, Plaintiffs have called for an ambulance a total of three times to assist them with transporting their adult son to the hospital for a mental health evaluation; SCPD officers always show up to accompany the ambulance staff [SOF ¶16]. At no time has their son ever threatened to harm himself or anyone else; violence was never a concern [SOF ¶17]. Plaintiffs' son has not been to a hospital for any mental health issues since 2021 [SOF ¶26].

---

[2] Plaintiffs' Statement of Undisputed Material Facts pursuant to Local Rule 56.1 is fully incorporated by referenced herein and made part of Plaintiffs' memorandum of law.

2

Each time, the SCPD officers always ask Plaintiffs if they own any weapons/if there are any weapons in the home, to which Diane responds 'yes' [SOF ¶18]. During at least one of the calls for an ambulance, SCPD officers confirmed that Plaintiffs store their firearms safely to prevent access by third parties, including their son [SOF ¶¶19-20]. Diane showed the SCPD officer the combination lock on the closet inside of their bedroom, opened the closet and showed the safe inside, opened the safe and showed that the firearms were trigger-locked, and showed a separate safe where the trigger-lock key was stored [SOF ¶¶19-20]. Plaintiffs' safe is very heavy and would take about four people to move [SOF ¶23]. Only Plaintiffs have the safe combination [SOF ¶24] and none of Plaintiffs' adult children have used their weapons [SOF ¶21]. Plaintiffs firearms were not seized during any of the times that SCPD responded with the ambulance staff [SOF ¶25].

In March 2021, Diane submitted her pistol license renewal application to the SCPD License Bureau, which was due to expire in April 2021 [SOF ¶¶27-28]. Diane's 2016 renewal was approved [SOF ¶29].

When a renewal application is submitted to the License Bureau, a secretary reviews the application and, if there are no issues, the renewal will be approved [SOF ¶¶30, 52]. This time, the secretary noted on Diane's pistol license file, "Failed to inform of CPEP of son – multiple incidents – assigned to Officer Plihcek" ("Plihcek") [SOF ¶31]. Sergeant William Walsh ("Sgt. Walsh") suspended Plaintiffs' pistol licenses by sending them a Notice of Suspension in April 2021 [SOF ¶¶32, 42, 44]. Plaintiffs were required to surrender their handguns to their local SCPD precinct, which they did [SOF ¶34], but SCPD did not seize from Plaintiffs, nor require them to surrender their, rifles and shotguns [SOF ¶39]. Plaintiffs' pistol licenses remain suspended [SOF ¶33].

3

*SCPD Policy and its Application to Plaintiffs*

The SCPD Pistol License Handbook (the "Handbook") contains the "rules, procedures, guidelines for a pistol licensee" and provides the grounds for suspending and/or revoking a license [SOF ¶¶46-48].The Handbook also identifies the requirements under state and federal law to be eligible to own a firearm [SOF ¶48]. Under the Handbook, "Aside from [] statutory prohibitors" the Handbook fabricates authority for the License Bureau to "make a determination about whether someone is eligible based on their discretion" [SOF ¶49]. References in the Handbook to "the licensing officer" mean and encompass the police commissioner's office, the lieutenant, the sergeant, or any licensing officer" in the License Bureau [SOF ¶51].

Under the Handbook, the absence of a statutory "automatic bar" to firearm possession "does not guarantee the issuance or renewal of a pistol license. There are many other factors that are considered in the investigation into an individual's qualification to possess a pistol license" [SOF ¶57]. For instance, if a household member of an applicant or licensee is "likely to engage in conduct that will result in serious harm to self or others" a renewal will be denied and/or application will be denied [SOF ¶58]. If SCPD feels there is "good cause" or "other good cause" or another reason a license should not be renewed, then it won't be [SOF ¶¶ 59-60]. But there is no "good cause" factor under Penal Law §400.00 to deny a licensee's renewal [Penal Law § 400.00(1)].

According to SCPD, there are "numerous scenarios" involving a *household member's* actions that could cause the suspension or revocation of a *licensee's* pistol license [SOF ¶69], including if licensee resides with someone who has a mental health issue, or a member of the household is transported to a hospital for a mental health-related issue, or a member of the household had a "psychiatric episode" [SOF ¶¶40, 55, 68]. A license will also be suspended or

4

revoked if a licensee does not report to the License Bureau that a household member was transported for a mental health evaluation [SOF ¶41]. This is so notwithstanding that the SCPD computer system alerts the License Bureau any time an officer responds to the home of a licensee for a mental health assist [SOF ¶¶53-54] and SCPD policies and procedures require police officers responding to a residence involving events that could cause the suspension or revocation of a pistol license to forward the incident reports to the License Bureau [SOF ¶ 70]. A pistol license will not be suspended (or will be reinstated) if the household member moves out [SOF ¶56].

SCPD officers are also required to "relay questionable behavior" about household members to the License Bureau [SOF ¶71].

Under SCPD policies, Plaintiffs are deemed "unfit" to possess handguns because their son needed a "mental health assist" and because they failed to report to the License Bureau the times that they called an ambulance to transport their son for a mental health evaluation [SOF ¶¶99-100]. Plaintiffs' pistol licenses were suspended by Sgt. Walsh for those two (2) reasons "based on the policy and procedure and handbook from the Pistol Licensing Bureau" [SOF ¶¶43, 61-63].

Once a Notice of Suspension is sent to a licensee, the matter is assigned to an investigator to perform the suspension investigation [SOF ¶64]. Plaintiffs' license suspension was assigned to Officer Ciara Plihcek [SOF ¶82].

Suspended licensees must provide a written statement regarding the underlying events leading to the suspension, which Plaintiffs did [SOF ¶¶35, 65]. Where the underlying incident involved a medical transport or a mental health issue, the licensee must also provide the mental health medical records of the household member pertaining to that incident [SOF ¶¶66, 72].

Licensees are also required to have the household member complete the SCPD mental health release form, which indicates "I am aware that the information disclosed pursuant to this

5

authorization may be subject to re-disclosure and would no longer be protected" [SOF ¶78].

Licensees are required to provide the mental health records of a household member so the investigating police officer can determine whether the non-licensee is "fit" to live in a house where firearms are possessed [SOF 74]. The mental health records of the non-licensed cohabitant are "necessary" for SCPD "to complete an investigation to determine the fitness of the above individual to reside in a home with firearms" [SPF ¶73]. SCPD does not have a psychiatrist, psychologist, or other mental health professional on staff to review the mental health records [SOF ¶76]. This policy has been enforced against other licensees who have had to provide the mental health records of household/family members before SCPD will reinstate their pistol licenses [SOF ¶73].

In addition to the mental health records of the household member, suspended licensees are also required to provide a letter from the co-habitant's physician indicating the "reason for treatment…medications prescribed and its effects, possible side effects on patient and your professional opinion as to the competence of the patient to reside in a home with firearms" [SOF ¶75]. A pistol license will not be reinstated without a letter from a physician stating that the co-habitant is fit to reside in a home where licensees possess firearms [SOF ¶¶77, 98].

SCPD required Plaintiffs to produce a letter from their son's doctor indicating that their son will not "harm himself or anyone else," which would "possibly" be the "first step in getting [their licenses] reinstated" [SOF ¶ 36].

Still, obtaining a letter from the son's treating physician indicating that he is "competent to reside in a home with firearms," would only be "the first step" to possible reinstatement of Plaintiffs' pistol licenses; even if a 911 check and background check came back clean, Plihcek requires both Plaintiffs submit "updated written statements" consisting of *a second* written

6

"statement of what occurred in the household" including any "new incidents" "before their licenses could be reinstated" [SOF ¶¶89-90]. If Plaintiffs' updated statements reveal new events with their son that Plaintiffs failed to report to the License Bureau in the interim, the suspension would continue for failure to comply with the Handbook [SOF ¶91]. There are just so "many variables" involved in the reinstatement of Plaintiffs' license - even if they could obtain a doctor's note and have no further 'incidents' because "each case is different" [SOF ¶ 92].

Under SCPD policy, Plaintiffs' safe storage of their firearms has no effect on the requirement that they obtain a doctor's written assurance that "it would be safe to have firearms in the house," nor does SCPD officers "verification" that all of Plaintiffs' firearms are locked up and secured [SOF ¶ 80]. Plihcek did not request or schedule any home visit to ascertain how Plaintiffs store their firearms, nor did she speak with any of the police officers who responded to Plaintiffs' home [SOF ¶¶93-94] because the safe storage of Plaintiffs' firearms is not relevant to the restoration of their licenses [SOF ¶ 95].

If Plaintiffs cannot obtain a letter from their adult son's treating physician stating that there are no issues with him residing in a home with firearms, their pistol licenses will not be reinstated, unless their son moves out of their home [SOF ¶¶87-88].

Diane spoke with their son's doctor, but she could not obtain the letter required by SCPD [SOF ¶37-38].

Under SCPD policy, a pistol licensee is "ineligible" to possess handguns if SCPD deems anyone in their household to be prohibited from possessing handguns [SOF ¶85]. Plaintiffs are deemed "ineligible to possess handguns" because *their son* is ineligible to possess firearms; it's a "common practice" that "the entire household is held to the same standard as the licensee, the same eligibility" [SOF ¶¶ 85-86]. "[I]f one person in the household is not eligible, the entire household

7

is held to that," which has been the policy since before Plihcek began working in the License Bureau in 2017 [SOF ¶¶81, 86]. Plihcek received no training from SCPD or the legal bureau regarding the Constitution or the Second Amendment [SOF ¶84]. Diane brought this action because it is her "right to own a gun and she did nothing to have it taken away" [SOF ¶101].

## LEGAL ARGUMENT

### Summary Judgment Standard

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See, *Adickes v S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970). Summary judgment is appropriate only where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party. *Leon v Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

There are no genuine issues of material fact to be determined in this matter and Plaintiffs are entitled to judgment as a matter of law.

### The *Bruen* Standard For Second Amendment Challenges

In keeping with *Heller*, the Supreme Court in *NYSRPA v. Bruen*, held that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17.

8

Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id.* (citation omitted).

Courts called upon to make such determinations are cautioned that "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, at 2136 quoting *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis in the original).

The scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. *Bruen*, 597 U.S. at 37.[3]

But to the extent later history contradicts what the text says, the text controls; liquidating indeterminacies in written laws is far removed from expanding or altering them. *Bruen*, 597 U.S. at 36 citing, *Gamble v. United States*, 587 U.S. ——, ——, 139 S.Ct. 1960, 1987 (2019) (THOMAS, J., concurring); see also Letter from J. Madison to N. Trist (Dec. 1831), in 9 Writings of James Madison 477 (G. Hunt ed. 1910).

The courts "must also guard against giving postenactment history more weight than it can rightly bear. *Bruen*, 597 U.S. at 35. Indeed, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (emphasis supplied) (citations omitted).

---

[3] Citing *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).

9

## I. PLAINTIFFS' CONDUCT FALLS WITHIN THE PLAIN TEXT

Conduct that falls within the plain text of the Second Amendment is presumptively protected by the Constitution. *Bruen*, 597 U.S. at 17.

Plaintiffs' conduct – possessing and carrying handguns for self-defense – has been *conclusively* deemed protected by the plain text of the Second Amendment.

> Putting all of these textual elements together, we find that they ***guarantee the individual right to possess and carry weapons in case of confrontation***.
>
> This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right.
>
> The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed."
>
> As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ...."

*Heller*, 554 U.S. at 592 (emphasis added); c.f., *Bruen*, 597 U.S. at 33 ("The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense").

The starting point for this Court's assessment of Suffolk County's justifications, when offered, is the presumption that Plaintiffs enjoy a pre-existing and guaranteed individual right to possess and carry handguns for self-defense.

## II. SUFFOLK COUNTY MUST NOW JUSTIFY ITS REGULATIONS

Under the *Bruen* test, the burden rests squarely on Suffolk County to justify its policies as set forth in the Handbook, which prohibit the right to possess handguns (i) based on the firearms disqualification of a household member; and (ii) because the individual did not inform the License Bureau of an event involving a third party.

10

No such 'tradition' existed in the Founding Era and, to the extent that Suffolk County musters up some theory grounded in post-ratification trend(s), any such policies would be patently inconsistent with the plain text of the Second Amendment.

Because Plaintiffs' conduct falls squarely inside of the Second Amendment's 'unqualified command,' Suffolk County's policies must be permanently enjoined.

### III.  SUFFOLK COUNTY'S POLICIES VIOLATE THE FOURTH AMENDMENT FACIALLY AND AS APPLIED TO PLAINTIFFS

The Fourth Amendment is implicated where there "is some meaningful interference with an individual's possessory interests in that property." See, e.g., *United States v Jacobsen*, 466 U.S. 109, 113 (1984).

The "general rule" is that absent an 'extraordinary situation' the government may not seize a person's property without a prior judicial determination that the seizure is justified. *Harrell v. City of New York*, 138 F. Supp. 3d 479, 488 (S.D.N.Y. 2015), on reconsideration in part sub nom. *Harrell v. Joshi*, No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015) quoting, *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 562 n. 12 (1983) (quotation marks omitted).

"It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Id.* quoting *Payton v. New York*, 445 U.S. 573, 583 (1980). Seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant, issued by a neutral magistrate after a finding of probable cause. *Id.*

Because Plaintiffs' ability to exercise the presumptively guaranteed right to possess handguns cannot occur without a valid New York State pistol license, Defendants' suspension of their licenses, *as a matter of law,* constitutes a "meaningful interference" with Plaintiffs' possessory interests in their property (handguns). The confiscation of Plaintiffs' handguns was unlawful because, *inter alia*, there was no warrant, the handguns were not contraband, nor evidence of a crime, and at no time were Plaintiffs "prohibited persons" under state or federal law.

Even under the eligibility requirements of Penal Law § 400.00(1), Plaintiffs remained "eligible" for the issuance and renewal of a pistol license.

Plaintiffs' 'surrender' of their handguns to the local SCPD precinct was not 'voluntary' - the alternative would be to suffer criminal penalties for possessing their handguns without a valid license. See, Penal Law § 265.00, *et seq.*

SCPD's dispossession of Plaintiffs' handguns was accomplished through the enforcement of unconstitutional policies to fabricate a basis to suspend their pistol licenses. There is no historical support for Suffolk County's confiscation of Plaintiffs' handguns, which is objectively unreasonable and in violation of the Fourth Amendment.

## IV. SUFFOLK COUNTY IS LIABLE UNDER *MONELL*

Suffolk County is liable for Plaintiffs' constitutional harms based on the established policies and practices testified to by Defendants Walsh and Plihcek, and as set forth in the License Bureau Handbook and reiterated in Sgt. Walsh' PowerPoint presentation to the Suffolk County Police Academy.  See, *Monell v Dep't of Social Servs. of the City of NY*, 436 U.S. 658, 98 S. Ct. 2018 (1978).

## CONCLUSION

Suffolk County's policies of (i) banning an individual's possession and/or carriage of firearms for self-defense based on the actions, condition, and/or status of third parties; (ii) banning an individual's possession and/or carriage of firearms based on who the individual resides with; (iii) banning an individual's possession and/or carriage of firearms because the individual did not provide notification to the Licensing Bureau of events that have no bearing on the individual's eligibility to possess firearms; and (iv) requiring individuals to provide medical and/or mental health records as a condition of issuing and/or renewing a pistol license are odious to the Second Amendment and are continuing to violate Plaintiffs' constitutional rights.

Plaintiffs' motion for summary judgment should be granted in its entirety, Suffolk County's policies permanently enjoined, and a hearing scheduled to determine the amount of Plaintiffs' monetary damages.

Dated: May 6, 2024
      Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: _____/s_____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10598
abell@bellantoni-law.com