UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS LAMARCO and DIANE LAMARCO,

                                              Plaintiffs,

                              -against-

SUFFOLK COUNTY, New York, Commissioner
RODNEY HARRISON, Individually and in his
Professional capacity, Captain WILLIAM SCRIMA,
Individually, Sgt. WILLIAM WALSH, Individually,
Police Officer CIARA PLIHCIK, Individually,

                                              Defendants.

**DEFENDANTS' COUNTERSTATEMENT
TO PLAINTIFF'S RULE 56. 1
STATEMENT AND
STATEMENT OF ADDITIONAL
MATERIAL FACTS**

**22 Civ. 4629 (GRB) (JMW)**

Defendants submit the following as and for their Counterstatement to Plaintiffs' Rule

56.1 Statement and Statement of Additional Material Facts:

**RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT**

1.      Thomas and Diane LaMarco are residents of Suffolk County, New York
[Bellantoni Declaration at Exhibit 7 at 5; Ex. 8 at 11-12].

        Admitted.

2.      The LaMarcos' adult son, Matthew, also resides with them [Ex. 7 at 26; Ex. 8 at
13].

        Admitted.

3.      Plaintiffs have held valid New York State pistol licenses issued by the
Suffolk County Police Department for 15+ and 10 years, respectively, without incident [Ex. 1
¶ 48].

        Denied. The LaMarcos have not held pistol licenses without incident.

On August 28, 2016, plaintiff Diane LaMarco ("Diane") called the Suffolk County Police Department ("SCPD") to report that Matthew, who was bi-polar, was having a psychiatric emergency and experiencing delusional and incoherent thoughts because he was not taking his medication. Diane told the 911 operator that Matthew "will probably give a hard time" to responders. Matthew was transported to Mather Hospital for emergency psychiatric evaluation (see Exhibit A, Incident Data and Exhibit B, Mental Health Assistance Incident Report). The Mental Health Assistance Incident Report (Exhibit B) completed by the responding police officer states "no pistol permit."

On July 30, 2017, Diane again contacted the SCPD and reported that Matthew hadn't been taking his medication, was walking around with a knife, and she was concerned for his wellbeing (see Exhibit C, Incident Data). Matthew was transported to Stony Brook Hospital by the SCPD for emergency psychiatric evaluation (see Exhibit D, Mental Health Assistance Incident Report and Exhibit E, Domestic Incident Report). The Mental Health Assistance Report prepared by the responding police officer (Exhibit D) states "pistol lic. check-neg."

On March 16, 2019, the LaMarcos called the SCPD for assistance with Matthew because he was possibly under the influence of alcohol, prescription psychiatric medication and marijuana, had used heroin previously, and they did not know if he had used heroin on this occasion. He was transported to Mather Hospital for emergency psychiatric evaluation and treatment. The SCPD's Incident Data form (see Exhibit F) states "no pistol license possessed, no pistol license on

2

premises." The same language is contained in the Field Report prepared by the responding police officer (see Exhibit G).

4.     At no time have Plaintiffs suffered from any prohibitor to the possession, purchase, use, or ownership of firearms [Ex. 1 ¶ 49].

Admit only that the LaMarcos are not prohibited from possessing, purchasing, using or owning firearms by federal law; otherwise denied as this is a statement of law, not fact, and it incorrectly states the law.

5.     On April 9, 2021, Defendants suspended Plaintiffs' pistol licenses for reasons unrelated to Plaintiffs' eligibility to possess firearms [Ex. 1 at ¶ 50].

Admit only that the suspensions were not for federal prohibitions against the LaMarcos' eligibility to possess firearms. Deny that the suspensions were not due to state and local prohibitions based on the New York State Penal Law and the then effective SCPD Pistol Licensing Bureau ("PLB") Handbooks.

***Thomas and Diane LaMarco***

6.     Thomas LaMarco ("Tom") has been employed as a Certified Public Accountant since 1989 [Ex. 7 at 6-7] and Diane has been employed for thirty-two years as a speech pathologist for a pre-school [Ex. 8 at 14-15].

Admitted.

7.     Tom holds a New York State pistol licenses issued by Suffolk County [Ex. 7 at 9-10].

Denied. As Tom admits above, his pistol license is suspended (see ¶ 5)

8.     Tom first obtained a New York State pistol license between 28-30 years ago [Ex. 7 at 16].

Admitted.

9.     Tom has two handguns registered to his pistol license [Ex. 7 at 17-18].

3

Admitted.

10.     Tom has used his handguns for target shooting, with Diane and by himself [Ex. 7 at 28-29].

Admitted.

11.     Until the events complained of in this action, Tom's pistol license had never been suspended [Ex. 7 at 35]. Diane LaMarco ("Diane") holds a New York State pistol license issued by the Suffolk County pistol License Bureau ("SCPD") [Ex. 8 at 16, 28].

Admitted.

12.     Diane was first issued a New York State pistol license in 2006 [Ex. 8 at 20].

Denied. Diane was first issued a pistol license on April 18, 2011 (see Exhibit H, Pistol Revolver License Application).

13.     When Diane applied for a pistol license, Tom had already had a New York State pistol license [Ex. 8 at 27].

Admitted.

14.      Diane has held a pistol license continuously since its issuance and, until the incidents at issue here, it has never been suspended or revoked [Ex. 8 at 29-30].

Admitted.

15.     Diane goes target shooting with the Smith & Wesson handgun registered to her pistol license [Ex. 8 at 54].

Admitted.

***Medical / Aided Calls for an Ambulance for the LaMarco's Adult Son, Matthew***

16.     The LaMarcos have called for an ambulance three times in the past to transport Matthew to the hospital for a mental health evaluation; SCPD officers always show up to

4

accompany the ambulance staff [Ex. 7 at 10, 14; Ex. 8 at 46-47].

> Deny that Matthew was transported for psychiatric evaluation on all 3 occasions by ambulance. On August 28, 2016 and July 30, 2017, Matthew was transported to the hospital by police (see Exhibits A, B and D).

17.     At no time has Matthew ever threatened to harm himself or anyone else; violence was never a concern [Ex. 8 at 55].

> Admit only that no such threats were made in the presence of the responding police officers (see Exhibits A through G); otherwise denied.

18.     When SCPD officers arrive with the ambulance staff[1], they ask if the LaMarcos own any weapons/if there are any weapons in the home; Diane has always responded, "yes" [Ex. 8 at 47-48].

> Deny that the responding police officers were aware that there were pistols in the LaMarcos' home (see Exhibits B through G).

19.     On at least one occasion, an SCPD officer asked how the weapons were secured and Diane showed the officer the combination lock on the closet inside of her and Tom's bedroom, she opened up the closet and showed the officer the safe inside of the closet; she opened up the safe and showed the officer that the firearms inside had trigger locks on them; she then showed the officer the separate safe where the trigger lock key was stored [Ex. 8 at 49].

> Denied (see Exhibits B through G).

20.     The handguns belonging to Tom and Diane, both of which are licensed, are stored in the combination locked closet safe [Ex. 8 at 60].

---

[1]     Defendant County of Suffolk does not operate an ambulance corps.

Admitted.

21.     None of the LaMarcos' adult children have used any of their weapons [Ex. 7 at 37].

Admitted.

22.     The LaMarcos also keep other important documents in the safe, not just firearms [Ex. 8 at 59].

Admitted.

23.     The safe in which the LaMarcos store their handguns is very heavy and cannot be easily moved; it would take about four people to move it [Ex. 8 at 49-50].

Admitted.

24.     No one other than Tom and Diane have the combination to the safe [Ex. 8 at 59].

Admitted.

25.     No SCPD officers seized the LaMarcos handguns at any time when officers responded with the ambulance staff [Ex. 8 at 50].

Admitted.

26.     Matthew has not been to a hospital for any mental health issues since 2021 [Ex. 8 at 52].

Admitted.

***April 2021 Suspension of LaMarcos' Pistol Licenses***

27.     Diane was required to renew her pistol license on or before April 2021 [Ex. 9 at 81-84].

Admitted.

28.     Diane filed her renewal application in March 2021 [Ex. 9 at 85].

Admitted.

29.     Diane's previous pistol license renewal was approved on February 1, 2016 [Ex.

9 at 81-82].

> Admitted.

30.     When a renewal application is submitted, a secretary reviews the application and, if there are no issues, the renewal will be approved [Ex. 10 at 15].

> Denied. Defendant Police Officer Ciara Plihcik ("Plihcik"), whose testimony is cited as supporting this allegation, is a low level police officer who is not familiar with the renewal process, is not involved in the renewal process, and does not know if a secretary can approve a renewal (see Exhibit I, relevant excerpt of deposition of Ciara Plihcik taken November 21, 2023, p. 15:9-16:4).

31.     In reviewing Diane's renewal application, a License Bureau staff member noted on Diane's pistol license file, "Failed to inform of CPEP[2] of son – multiple incidents – assigned to Officer Plihcek" [Ex. 9 at 83-84].

> Admitted.

32.     In April 2021, Walsh suspended Diane's pistol license by letter Notice of Suspension; Diane's was dated April 9, 2021 and Tom's was dated April 12, 2021 [Ex. 2].

> Admitted.

33.     The LaMarcos' pistol licenses are still suspended [Ex. 7 at 18; Ex. 8 at 71].

> Admitted.

34.     Diane and Tom were required to surrender their handguns to their local SCPD precinct, which they did [Ex. 2; Ex. 8 at 63; Ex. 7 at 34-35; Ex. 9 at 79].

> Admitted.

35.     Tom and Diane were required by Officer Ciara Plihcek to write a letter

---

[2] CPEP is the acronym for Stony Brook University Hospital's Comprehensive Psychiatric Emergency Program.

explaining the circumstances surrounding the suspension of their licenses [Ex. 7 at 29-30] which Tom wrote for the both of them [Ex. 3; Ex. 7 at 30].

> Denied. The suspension letters signed by Walsh directed each plaintiff to submit a sworn statement thoroughly explaining in detail the circumstances surrounding the incident in their own words (see Exhibit J, Thomas' suspension letter and Exhibit K, Diane's suspension letter). The LaMarcos failed to comply with this direction. Instead, they submitted a single unsworn letter and two blank "statements," one in the name of each plaintiff but bearing apparently identical illegible signatures and both notarized by Tom (see Exhibit L, unsworn letter and blank "statements" ).[3]

36.    Within a week or two after being suspended, Tom had two telephone conversations with the License Bureau, one of which was with Officer Plihcek, about what needed to be done to reinstate their licenses; he was told that he must produce a letter from Matthew's doctor indicating that Matthew is not in a position to harm himself or anyone else, and that would "possibly" be the "first step in getting it reinstated" [Ex. 7 at 19-22].

> Denied. Thomas was told that the suspensions would be lifted if the LaMarcos received a note from Matthew's treating physician stating that there were no issues with him residing in a home with firearms or if Matthew moved out of their home (see Exhibit I, p. 22:15-22)

37.    Diane spoke with Matthew's doctor, but she could not obtain a doctor's letter to provide to the License Bureau regarding Matthew [Ex. 8 at 65-68; Ex. 7 at 21-22].

---

[3] Tom's "notarization" of his own signature is contrary to 19 NYCRR § 182.3 (5) which disqualifies a notary from "perform[ing] notarial acts for transactions in which the notary is a party."

Admitted.

38.     After not being able to obtain a letter from Matthew's doctors, Tom contacted an attorney [Ex. 7 at 23].

Admitted.

39.     Tom still possesses several long guns - shotguns and rifles - in his home, which are stored in the locked bedroom closet [Ex. 7 at 25, 27-28].

Admitted.

***Suffolk County Policy***

40.     The LaMarcos' licenses were suspended because "a mental health assist" occurred concerning "member of [their] household" [Ex. 2; Ex. 8 at 30-33].

Denied. A "mental health assist" involving a member of their household was not the sole basis for the suspensions. The suspensions were also expressly based on the LaMarcos' failure to notify PLB of the incident as required by the Handbook (see Exhibits J and K).

41.     The LaMarcos' licenses were suspended because they did not report to the License Bureau that "a mental health assist" occurred concerning "member of [their] household" [Ex. 2; Ex. 8 at 30-33].

Denied. The LaMarco's licenses were suspended both because of the "mental health assist" and their failure to notify PLB of the incident as required by the Handbook (see Exhibits J and K).

***Defendant, William Walsh***

42.     At all times relevant to this action, William Walsh ("Walsh") was the Sergeant of the SCPD Pistol License Bureau [Ex. 9 at 11].

Admitted.

43.     In April 2021, Walsh signed Notices of Suspension for licensees suspending their pistol licenses "based on the policy and procedure and handbook from the Pistol License Bureau" [Ex. 9 at 17].

Admitted.

44.     Walsh had authority to sign Notices of Suspension and suspend pistol licenses when his lieutenant was not in the office [Ex. 9 at 27, 28].

Admitted.

45.     The licensee is suspended on the date the letter of suspension is sent [Ex. 9 at 29].

Admitted.

46.     SCPD publishes a Pistol License Handbook ("Handbook") that contains the "rules, procedures, guidelines for a pistol licensee" [Ex. 9 at 20].

Admitted.

47.     The Handbook provides licensees with information about the circumstances under which their license could be suspended or revoked [Ex. 9 at 21].

Admitted.

48.     The Handbook identifies the requirements under state and federal law for an individual to be eligible to own a firearm [Ex. 9 at 23].

Admitted.

49.     According to the Handbook, "Aside from [] statutory prohibitors, the Pistol License Bureau can also make a determination about whether someone is eligible based on their discretion" [Ex. 9 at 23-24].

Admitted.

10

50.     Under the Handbook, if anyone residing in the home (including a non-licensee) is arrested, and the licensee does not report the incident to the License Bureau, the licensee's pistol can be suspended or revoked [Ex. 9 at 25-26].

        Admitted.

51.     References in the Handbook to "the licensing officer" mean and encompass the police commissioner's office, the lieutenant, the sergeant, or any licensing officer in the License Bureau [Ex. 9 at 27].

        Admitted.

52.     At the renewal of a pistol license, the License Bureau renewal performs a "review of the licensee of any incidents that may be police related that happened the prior -- during the time that -- that they had the license" [Ex. 9 at 32].

        Admitted.

53.     Through SCPD computer programming, the License Bureau is notified of certain incidents including mental health issues when SCPD officers respond to the home of a licensee for a mental health assist [Ex. 9 at 32-33].

        Admitted.

54.     When SCPD officers respond to a licensee's home relating to the mental health of a licensee or any household members, that information is sent to the License Bureau [Ex. 9 at 33-34].

        Deny that information about every type of mental health incident in a licensee's home is automatically transmitted to PLB; admit only that information about some types of mental health incidents in a licensee's home may be transmitted to PLB (see Exhibit M, relevant excerpt of deposition of William Walsh taken

11

November 16, 2023, p. 31:22-34:6).

55.     Under SCPD policy, if a licensee resides with someone who had a mental health issue or who was transported to a hospital for a mental health-related issue, that constitutes grounds to suspend the licensee's pistol license [Ex. 9 at 34-36].

> Admit only that the SCPD has generally, but not necessarily, suspended licenses where a member of the licensee's household has been transported for mental health treatment (see Exhibit M, p. 34:7-36:9); otherwise denied.

56.     A pistol license would not be suspended (or the suspension would be lifted) if the co-habitant moved out of the licensee's home [Ex. 9 at 35].

> Admitted.

57.     Under the Handbook, the absence of a statutory "automatic bar" to firearm possession  "does not guarantee the issuance or renewal of a pistol license. There are many other factors that are considered in the investigation into an individual's qualification to possess a pistol license" [Ex. 6; Ex. 9 at 36].

> Admitted.

58.     If a household member of an applicant or licensee is "likely to engage in conduct that will result in serious harm to self or others" a renewal will be denied and/or application will be denied [Ex. 6; Ex. 9 at 37-39].

> Deny that the Handbook contains this language; admit only that a license may be disapproved if the New York State Director of Community Services or his or her designee has made a report pursuant to § 9.46 of the N.Y. Mental Hygiene Law indicating that the applicant or member of their household is likely to engage in conduct that would result in serious harm to self or others; otherwise

denied.

59.     Under the Handbook, if the License Bureau feels there is 'good cause' or "other good cause" - another reason why they shouldn't renew a pistol license - then the license will not be renewed [Ex. 6; Ex. 9 at 39].

        Admitted.

60.     There is "discretion" exercised as to whether to renew the license [Ex. 9 at 39].

        Admitted.

61.     The LaMarcos' licenses were suspended after an administrative review identified that SCPD police officers had responded to their home regarding a mental health issue concerning their son, Matthew [Ex. 10 at 9-10].

        Denied. The police officers' response to the LaMarcos' home regarding their son's mental health was not the only basis for their suspensions. The suspensions were expressly based on both the mental health assistance for Matthew and the LaMarcos' failure to notify PLB of the incident (see Exhibits J and K).

62.     The LaMarcos were required by the Handbook to inform the License Bureau that their son "required mental health assistance"; their failure to inform required the suspension of their licenses [Ex. 10 at 9-10].

        Denied. The LaMarcos' failure to inform PLB that their son required mental health assistance was not the only basis for their suspensions. The suspensions were expressly based on both the mental health assistance for Matthew and the LaMarcos' failure to notify PLB of the incident (see Exhibits J and K).

63.     Walsh made the decision to suspend the LaMarcos' pistol licenses [Ex. 1; Ex. 9

13

at 72-73;].

> Admitted.

64.     Once the suspension notice is sent to the licensee, the matter is assigned to an investigator to perform the suspension investigation [Ex. 9 at 43-44].

> Admitted.

65.     Suspended licensees must provide a written statement regarding the underlying events leading to the suspension, including Thomas and Diane LaMarco [Ex. 3; Ex. 9 at 44, 64, 75-76].

> Admitted.

66.     Where the underlying incident involved a medical transport or a mental health issue, the licensee must also provide the underlying medical records pertaining to that incident [Ex. 4; Ex. 9 at 45, 60].

> Admitted.

67.     Walsh created a PowerPoint presentation to use in his instruction at the Police Suffolk County Academy related to pistol licensing policies in effect in 2020-2021 [Ex. 5; Ex. 9 at 47-51].

> Admit only that Walsh created a Power Point which he used to instruct SCPD officers in supervision school and non-County seasonal police officers[4]; otherwise denied (see Exhibit M, p. 47:3-47:8).

68.     Events giving rise to "grounds" for "suspension or revocation" of a pistol license include "a psychiatric episode concerning a household member of a licensee" [Ex. 9 at 51-53].

---

[4]  The SCPD does not employ part time seasonal police officers. Presumably the part time seasonal police officers referred to were employed by the towns and villages in the County's vacation communities of Fire Island and the Hamptons.

Admitted.

69.     There are "numerous scenarios" involving a household member's actions that could cause the suspension or revocation of a licensee's pistol license [Ex. 9 at 51-55].

Admitted.

70.     Under the policies and procedure of SCPD, police officers responding to a residence involving any events that could cause the suspension or revocation of a pistol license are required to forward the incident reports to the Pistol License Bureau [Ex. 9 at 57-58].

Deny that the cited transcript supports this assertion and that SCPD officers are able to forward such reports if they are unaware that a licensee resides at the residence.

71.     SCPD officers are also required to "relay questionable behavior" for licensees and household members to the License Bureau [Ex. 9 at 59-60].

Admit only that for SCPD officers to be able to "relay questionable behavior" by licensees and their household members, they must be aware someone in the household is a licensee; otherwise denied.

72.     SCPD required licensees to obtain the medical records of household members who are transported for a mental health evaluation [Ex. 4; Ex. 9 at 61-62].

Admit only that licensees are required to obtain the medical records of household members transported to mental health facilities by the SCPD (see Exhibit N, Walsh deposition, p. 62:24 -63:8); otherwise denied.

73.     Licensees have previously obtained the written authorization of family members allowing the License Bureau to obtain the mental health records of their household/family members so SCPD will reinstate their pistol licenses [Ex. 9 at 62-63]. The

mental health records of the non-licensee cohabitant are "necessary" for SCPD "to complete an investigation to determine the fitness of the above individual to reside in a home with firearms" [Ex. 4; Ex. 9 at 64].

>Admitted.

74.   SCPD requires the mental health records of a non-licensee so the investigating police officer can determine whether the non-licensee is "fit" to live in a house where firearms are possessed [Ex. 4; Ex. 9 at 64-65].

>Admitted.

75.   The SCPD medical records release form also requires the licensee to provide a letter from the co-habitant's physician indicating the "reason for treatment...medications prescribed and its effects, possible side effects on patient and your professional opinion as to the competence of the patient to reside in a home with firearms" [Ex. 4; Ex. 9 at 67].

>Admitted.

76.   SCPD does not have a psychiatrist, psychologist, or other mental health professional on staff to review the mental health records [Ex. 9 at 66].

>Admitted.

77.   A license's pistol license will not be reinstated without a letter from a physician stating that the co-habitant is fit to reside in a home where other people possess firearms [Ex. 9 at 69].

>Admit only that the LaMarcos' licenses will not be reinstated without a letter from a medical professional; deny that the letter must be from the treating physician (see Exhibit N, p. 68:6-69:14).

78.   The SCPD mental health release indicates "I am aware that the information

16

disclosed pursuant to this authorization may be subject to re-disclosure and would no longer be protected" [Ex. 4; Ex. 9 at 70].

> Admitted.

79. Under the SCPD mental health release, a failure to obtain the authorization from the household member "will affect my eligibility to possess a pistol license" even though the firearms are stored from the co-habitant [Ex. 4; Ex. 9 at 71].

> Admitted.

80. The safe storage of firearms from co-habitants is irrelevant to the requirement that licensees obtain a doctor's written assurance that "it would be safe to have firearms in the house," even if SCPD officers "verified" that all the LaMarcos' firearms are locked up [Ex. 9 at 77-78].

> Admit only that even if the licensee claims that their weapons are safely stored,
> a letter from a doctor is still required; otherwise denied (see Exhibit N, p. 76:23-
> 78:21).

### *Defendant, Ciara Plihcek*

81. Police Officer Ciara Plihcek was assigned to the Pistol License Bureau in 2017 [Ex. 10 at 13].

> Admitted.

82. After the LaMarcos' pistol licenses were suspended by Sgt. Walsh, their files were assigned to Officer Plihcek for investigation [Ex. 9 at 84; Ex. 10 at 16].

> Admitted.

83. Plihcek was notified that the LaMarcos' licenses were suspended because they failed to notify Pistol License Bureau of a mental health issue within their household as they

were required to do so" [Ex. 10 at 17].

> Admitted.

84.     Plihcek received no training from SCPD or the legal bureau at SCPD regarding the Constitution or the Second Amendment [Ex. 10 at 20].

> Denied. Although Plihcik had no formal training regarding constitutional issues and/or the Second Amendment while in PLB, she had on the job training at PLB with supervisors and co-workers, in addition to police academy training and ongoing in-service training required of all police officers (see Exhibit I, p. 19:4-20:22).

85.     When asked how Tom LaMarco was "ineligible to possess handguns" based on the fact that his son is ineligible to possess firearms, Plihcek responded, "Because it's a common practice at the Pistol License Bureau that the entire household is held to the same standard as the licensee, the same eligibility" [Ex. 10 at 21].

> Admitted.

86.     Under SCPD policy, "if one person in the household is not eligible, the entire household is held to that" [Ex. 10 at 22]; this policy has been in effect since Plihcek began working in the License Bureau in 2017 [Ex. 10 at 22].

> Admit only that Plihcik gave the cited testimony; deny that as a low level police officer, she is a policy maker or authorized to speak on behalf of the County.

87.     The LaMarcos cannot have their pistol licenses reinstated until they "receive a note from their son's treating physician stating that there's no issues with him residing in a home with firearms or if his son moved out of his home" [Ex. 10 at 22, 29-30].

> Admitted.

88.    If the LaMarcos cannot obtain a letter from their son's doctor, their licenses will remain in a suspended status [Ex. 10 at 22-23].

> Deny that the LaMarcos' license will remain in suspension if Matthew moves out of their home (See Exhibit I, p. 22:15-22).

89.    Even if the LaMarcos obtained the requested doctor's letter, that would only be "the first step" to reinstating their pistol licenses; Plihcek would still have to conduct an "investigation [Ex. 10 at 32].

> Admit only that as shown by the cited transcript, even if the LaMarcos' obtained the requested letter, an investigation would still need to be conducted because Matthew's mental health is not the only factor to be considered with respect to whether they should have pistol licenses; otherwise denied.

90.    Even if the LaMarcos submitted a letter from their son's treating physician that he is "competent to reside in a home with firearms," and a 911 check and background check were run and came back clean, Plihcek would still need to obtain "updated written statements from both of the licensees" consisting of another "statement of what occurred in the household" including any "new incidents" "before their licenses could be reinstated [Ex. 10 at 32-34].

> Admitted.

91.    If the updated statements reveal new events with their son that the LaMarcos had not reported to the License Bureau in the interim, the suspension of their licenses would continue because they did not comply with the Handbook [Ex. 10 at 32-36].

> Admit only that if updated statements revealed that the LaMarcos again failed to report to PLB any matters the Handbook requires them to report, concerning Matthew or otherwise, the suspensions could potentially continue; otherwise

19

denied (see Exhibit I, p. 35:4-36:1).

92.     There are "many variables" involved as to whether the LaMarcos' licenses will be reinstated, even if they obtain a doctor's note, and have no further incidents; "each case is different" [Ex. 10 at 37].

        Admitted.

93.     Plihcek did not speak with any of the police officers who responded to the LaMarcos' home [Ex. 10 at 23].

        Admitted.

94.     Plihcek did not request or schedule any home visit to ascertain how the LaMarcos store their firearms [Ex. 10 at 23].

        Admitted.

95.     Plihcek learned of how the LaMarcos store their firearms from their file but safe storage of their firearms is not relevant to the restoration of their licenses [Ex. 10 at 24-25].

        Deny that the manner in which the LaMarcos' store their weapons is irrelevant to whether their licenses can be restored; admit only that safe storage alone will not entitle the LaMarcos' to have their licenses restored (see Exhibit I, p. 24:1-25:20)

96.     The LaMarcos' son is "ineligible" to possess firearms based on the fact that he was "transported to a psyche ward for a mental health evaluation" [Ex. 10 at 25].

        Denied. The cited testimony does not indicate that that Matthew is ineligible simply because he was transported for a mental health evaluation (see Exhibit I, p. 25:7-14).

97.     Under SCPD policy, a transport for an evaluation alone renders someone

"ineligible" to possess firearms [Ex. 10 at 25].

> Admit only that Plihcik gave the cited testimony; deny that as a low level police
> officer, she is a policy maker or authorized to speak on behalf of the County.

98.     Walsh and Plihcek required the LaMarcos to obtain a medical release from their
adult son, Matthew, to obtain Matthew's mental health records be sent to the License Bureau
for review in connection with the suspension of the LaMarcos' pistol license [Ex. 9 at 61; Ex.
10 at 26-27; Ex. 4].

> Admitted.

99.     Under SCPD policies, the LaMarcos were deemed by Walsh to be "unfit" to
possess handguns because their son needed and had a "mental health assist" [Ex. 9 at 73].

> Denied. Walsh signed the suspension letters both because Matthew received a
> mental health assist and because the LaMarcos failed to notify PLB of his
> transport for mental health as required by the Handbook (see Exhibit N, p. 74:8-
> 19).

100.    The LaMarcos were deemed unfit to possess handguns because the Handbook
defined them as being unfit for not reporting to the License Bureau the incidents where an
ambulance was called to transport their son for a mental health evaluation [Ex. 9 at 73-74].

> Denied. The Handbook does not define anyone as unfit; Walsh signed the
> suspension letters both because Matthew needed a mental health assist and
> because the LaMarcos failed to notify PLB of his transport for mental health as
> required by the Handbook (see Exhibit N, p. 74:8-19).

101.    Diane brought this action because it is her "right to own a gun and she did
nothing to have it taken away" [Ex. 8 at 16-17].

Deny that the Second Amendment confers an unlimited right to possess and

carry handguns.

**DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

102.    On February 16, 2006, Thomas signed a Pistol License Holder Handbook Receipt which

stated:

> I the above Suffolk County Pistol License holder, acknowledge receipt
> of my copy of the PISTOL LICENSE INFORMATION HANDBOOK and I
> understand that as a pistol license holder, I am responsible to know the
> contents of this book. I also understand that the failure to comply with
> the rules and regulations in the handbook may result in the suspension
> and or revocation of my Suffolk County Pistol License (see Exhibit O).

103.    On October 20, 2010, Diane signed a Pistol License Applicant Handbook Receipt which

stated:

> Notification responsibilities are explained fully in the PISTOL LICENSE
> INFORMATION HANDBOOK…. I, the above Suffolk County Pistol
> License applicant, acknowledge receipt of my copy of the PISTOL
> LICENSE INFORMATION HANDBOOK…I will be responsible to know
> the contents of this book. I also understand that the failure to comply
> with the rules and regulations in the handbook may result in
> suspension and/ or revocation of any Suffolk County Pistol License that
> may be issued to me as a result of this application (see Exhibit P).

104.    In April 2021, the month the LaMarcos' licenses were suspended, the operative PLB

Handbook, in Section 4 of Chapter 4 Duties and Liabilities of a License Holder listed "Incidents that

require you to notify the Licensing Bureau…within 24 hours of occurrence:" The list included "11.

Evaluation of any member of your immediate household for mental health issues." The grounds for

suspension and/ or revocation set forth in Section 5 stated that pursuant to N.Y. Penal Law § 400.00

the license could be revoked or cancelled at any time (see Exhibit Q, relevant excerpt of 2020 Pistol

22

License Handbook).

105.    The 2016 edition of the Handbook also required that a licensee notify PLB within 24 hours "[w]hen any member of [their] household receives professional treatment for mental health issues." Further, the 2016 Handbook also provided that a licensee's failure to comply with the notification requirements was ground for suspension and/or revocation of the license (see Exhibit R, relevant excerpt of 2016 Pistol License Handbook).

106.    The LaMarcos never notified PLB that Matthew had been given a mental health evaluation (see Exhibit S, relevant excerpt of deposition of Diane LaMarco taken August 30, 2023, p. 50:18-51:24).

107.    Melissa Sosich, with whom Matthew treated at Catholic Charities is not a physician. She is a Licensed Mental Health Counselor (see Exhibit T).

108.    The LaMarcos' were unable to get a letter from Matthew's treating physician stating that there are no issues with Matthew residing in a home where firearms are kept (see Exhibit S, p. 65:9-66:23). They were also unable to get a note from Melissa Sosich (See Exhibit T).

DATED:  Hauppauge, New York
        May 17, 2024                         Yours etc.,
                                             Christopher J. Clayton
                                             Suffolk County Attorney
                                             Attorney for Defendants
                                             H. Lee Dennison Building
                                             100 Veterans Memorial Highway
                                             Hauppauge, New York 11788

                                     By:     */s/ Arlene S. Zwilling*
                                             Arlene S. Zwilling
                                             Assistant County Attorney